jBy the Court

Jenkins, J.,
delivering the opinion.
The Confederate States of America being at war with the United States of America, exercising the “power to raise armies” for the public defense, resorted to compulsory enrollment by classification of the population capable of bearing arms. In one of the Acts of the Congress, passed for this purpose, 16i/i April, 1862, is a section in these words, “persons not liable for duty may be received as substitutes for those who are, under such regulations as may be prescribed by the Secretary of War.” That officer having prescribed regulations for substitution, Fitzgerald, Daly and Cohen, promovants in the proceedings recited in the Reporter’s statement, furnished substitutes who were accepted by the proper authorities and they discharged. By a subsequent Act, the Congress forbade the future reception of substitutes, and by a still later one, (January bill, 1864,) enacted “ that no person shall be exempted from military service by reason of his having furnished a substitute,” etc. Thereupon, the *41 parties above named were enrolled and sued out writs of habeas corpus (two of them applying to Judge Lochrane and one to Judge Bigham, of the Superior Courts,) to test their liability to military service, under the circumstances. These cases were made to turn upon the constitutionality of the following Act of Congress, approved 5th January, 1864:
“ Whereas, In the present circumstances of the country, it requires the aid of all who are able to bear arms, the Congress of the Confederate States of America do enact, that no person shall be exempted from military service by reason of his having furnished a substitute, but this Act shall not be so construed as to affect persons who are not liable to render military service, but who have, nevertheless, furnished substitutes.”
In behalf of the applicants, it was insisted that this Act is unconstitutional, in that it deprives them of the right of exemption from military service vested in them by a contract between the Confederate government and themselves, severally, and so violates that contract. This contract, they alleged, is to be found in the transaction between the parties, authorized by statutes, whereby a substitute had been previously tendered by and accepted for each of them, and he discharged. Opposed to this view was the proposition that substitution, as authorized by the Act 16í/¡, April, 1862, was a gratuitous privilege, available whilst the 9th section of that Act remained in force, but revokable at the will of the Legislature that granted it. One of our brethren of the Court below held the former, the other the latter proposition, and we are now called upon to review their judgment. The prima facie case made consists in a written discharge from military service, (appearing in the record,) which is adduced as evidence of the contract relied on. Such discharges are acts of enrolling officers, subordinates of the War Department, and we must consider, first, what their language imports, and secondly, whether the thing imported to be done falls within the pale of the officer’s authority. Looking to the records in the three cases now before us, we find a contrariety of practice. Cohen, as appears in the record, exhibited no written evidence of his discharge, but in the bill of exceptions there is a recital which we take as an agreed statement of facts, in these words: “ The peti *42 tioner, while a private in the army of the Confederate States, put in a substitute over forty-five years of age, and was, therefore, finally discharged.” This stands as a certificate of discharge.
Fitzgerald presents a paper, duly signed, which, after reciting the tender and acceptance of his substitute, “ for three years, or during the war,” concludes thus: “Philip Fitzgerald is hereby relieved from military duty, under said law, for that time.”
Daly exhibits, in proof of his exemption by contract, a paper, signed *by an enrolling officer, which simply certifies the tender by him of a substitute, who was examined as to his fitness for service, approved and mustered in. Nothing more. It is clear that these three persons are entitled, under the same'provisions of law, and a precisely similar state of facts, to the same exemption, yet one is declared “finally discharged,” another “ relieved from military duty for three years, or during the war,” and the third is dismissed with a simple certificate of the presentation by him and the acceptance of a qualified substitute. "VYe infer that there' is no uniformity of practice — no prescribed formula of discharge in such cases, and that each officer empowered to accept substitutes, furnishes to the principal a certificate framed according to his own ideas of fitness, signifying to all whom it may concern that the holder has complied with all the requirements of the law regarding substitution, and is entitled to such exemption as the law allows him. This protects him from enrollment by any other officer, into whose department he might chance to go, and who, but for it, would be ignorant of his exemption. If any certificate should go further and grant, by its terms, any larger exemptions than is sanctioned by the statute, it would be simply void. Again, it is said that such discharges as that presented by Fitzgerald are sanctioned by the Secretary of War, and are, therefore, binding upon the government, but of this no evidence has been adduced. Indeed, our investigation on this point tends to an opposite conclusion. We find in general order, number eighty-two, issued November 8th, 1862, paragraph 2, section 11, title “Substitutes,” this regulation : “And if the substitute be capable of bearing arms, and be ■of good moral character, and not within the prohibited classes, *43 lie shall be received, and the principal shall he exempt from military service.” This is all. It is not that he shall be finally discharged, nor that he shall be discharged for three years, or during the loarfi but that he shall be “ exempt.” How exempt ? By fair interpretation, exempted according to the true intent and meaning of the 9th section of the Act of 16th April, 1862. And to this test the acts of all executive officers, whether high or low, must be brought. Within the pale of the law, they are valid and binding; without it, they have no efficacy whatever.
It is now apparent that in order to set up a contract, the party alleging it must have recourse not only to what actually transpired at the time of substitution, but to the Act of the Congress authorizing it. He must deduce from that an intention, a purpose not simply to exempt, but to exempt hy contract. And this done, he must go a step further and show that such intent and purpose are compatible with the power abiding in Congress, for that body itself governs not by absolute but by chartered authority. Thus is the investigation resolved into two inquiries: 1st, as to the intention of Congress. The contract upon which the applicants rely is that of absolute exemption from military service for three years or during the war, the full term of their enrollment, in consideration of each having furnished a substitute accepted by the government. Did the Congress so intend ? for beyond their real intent and meaning they cannot be bound. The understanding and intention of the other party to'the transaction is not conclusive. Mutuality of intention or assent is of the essence of a contract: Chitty on Contracts, 3, 4; 1 Comyn’s Digest, Art. Agreement. It has been repeatedly asserted in the argument that every element of a contract was to be found in this transaction of substitution. We propose to test the correctness of this assumption. The books contain several definitions of a contract, differing in phraseology, but agreeing in substance. Probably the most carefully considered and comprehensive “is an agreement upon sufficient consideration to do or not to do a particular thing between parties able to contract, willing to contract, and actually contracting. Our present inquiry is, whether or not Congress, in providing for substitution, had the xoill, the intention to make a contract. It *44 involves a construction of the ninth section of the Act of April, 1862, before referred to. We shall be aided' in the inquiry by looking first to the subject matter of legislation, which appears both from the title and the body of the Act to be “further to provide for the public defense." To comprehend it fully, however, it is proper to consider the condition of the country and the relation existing between the parties to the transaction at the time of the passage of the Act. The Confederate Stales were at war and in a state of invasion — established when they were without a standing army, by a foreign power, stronger in all military appointments, and having an arms-bearing population more numerous than their own. The Confederate government was, therefore, greatly in need of soldiers, and had in prospect an absolute want of the whole available physical force at their command for defense. This is an unexaggerated statement of the condition of the country. The government is by its constitution invested with ample power over the population to raise armies, and resorted to compulsory enrollment of citizens for military service. The statute in question provided for the enrollment of one class which included these applicants and contemplated their actual enrollment as an antecedent of substitution. The government then exacted of them a service which they owed it, and from which they had no escape, as matter of right. Such was the relation existing between the parties. We ask, then, in limine, in this condition of the country, and possessing this absolute power over the citizen, is it presumable (in the absence of the clearest indications of intention,) that the Congress intended by the contract to abrogate that power over him, to diminish the available physical resources at their disposal?
It may be said, that it does not diminish the power of the government, because another, not subject, by law, but equally capable, is put in the place of the exempt, with the condition annexed, that should the substitute during the term, be made personally liable, the substitution ceases and liability reattaches to the principal. But (conceding it to be a contract) suppose a substitute, whilst occupying that position, is slain in battle, would the liability of the principal ipso facto recur? This in *45 such a case would scarcely be conceded by those who recognize in the transaction a valid contract. They would insist that the substitute slain is beyond the power of the Congress — cannot be liable, and that, therefore, the conditions in which liability should reattach to the principal within the three years had become impossible by the casualties of \yar, against which the purchased exemption had protected him. But, on the other hand, had there been no substitution, and had the principal, occupying his own place, been slain, the other would have remained subject to the call of the government. And again, regarding the substitution, not as a binding contract, but as a revocable privilege, upon the fall of the substitute, the principal might be forthwith sent to the field. This view of the danger of loss to the public service is too palpable to admit the supposition that it could have escaped the attention of Congress. Substitution, viewed as a binding contract, could not possibly increase, but would probably diminish the available force. Hence, by the subject matter, one of the guiding lights in the construction of statutes, (1 Blackstone’s Commentary, 60,) we are preadfnonished against this view in case there be ambiguity in the words of the statutes. But we do not perceive that they are ambiguous. Having by the previous sections provided for placing in the service a certain class of citizens accurately described, the Congress by the 9 th section enact that “persons not liable for duty may be received as substitutes for those who are, under such regulations as the Secretary of War may prescribeHerein is no specified terms of a substitution exemption, no declaration of legal consequences to ensue, nothing which savors of abdication or suspension of the power confessedly possessed by the Legislature over him who is permitted to furnish a substitute and which it was the express object of the Act to exert. It must be kept steadily in view that this was not a control derived from contract, but political authority resulting from the delegation of acknowledged sovereignty to one of the parties over the other. In the preceding section the language is mandatory; in this, merely permissive. The inference seems very clear to us that exemption by grace was intended to continue at the will of the Legislature. This will might reasonably be expected to prolong the exemp *46 tion whilst, and only whilst, in the opinion of the Legislature, it should be compatible with the safety of the country. When the legislative department, seeking to enlist private persons in an enterprise promising beneficial results to the body politic, but in which they cannot compel them to embark, (as the founding and endowment of seminaries of learning, the construction of railroads and canals, and other like objects,) enacts a law granting to those who may associate themselves, and contribute the necessary capital and actually enter upon the enterprise, certain franchises or bounties, such a law is justly regarded a contract executed. Courts will not permit the Legislature, by a subsequent Act, to withdraw the franchises or bounties thus granted, whilst the other parties faithfully exercise the former, and appropriate the latter.
In all such cases it is supposed that the Legislature intended to bind the State irrevocably, to the extent indicated in the Act, as nothing else could have induced the appropriation of individual time,_ money and labor, the contributors owing no such positive duty. Of this character was the great Dartmouth College ease, and many others placed upon its authority, which have been relied upon in the argument of this case. But cases Avherein the Legislature has unlimited authority over jmrsons sought to be used has but to command and they must obey, stand upon a very different footing. If in a laAv exacting such servitude, there be embodied a privilege of exemption, which can by no possibility promote, but may, in certain contingencies, retard or obstruct the attainment of the end proposed, the reason upon Avhich statutes Avere in the former class of cases held to be contracts executed, utterly fails, and a different rule of construction obtains. In one instance, the government descends from its high potential position and says to certain citizens, here is an object to be accomplished which will benefit the Avhole people, and it is fit and proper that it be effected by private enterprise; if you will undertake it, I will grant you certain franchises which will render the doing of it more easy and more profitable. In the other, from its eminence of power it speaks and says to them, the country is in danger, national existence is menaced, you all OAve military service, I bid you to *47 the field. In the one case it uses the language of contract, do ut facias; in the other that of supreme command, sic volo, sic jubeo. No degree of clemency with which the Legislature may choose to temper the exercise of prerogative, can transmute either command into contract or its accompanying privilege into vested right. Upon this reasoning we dispose of that class of cases as inapplicable which establishes the principle that Courts will construe statutes vesting personal rights as contracts executed, and will hold the legislative department to the faithful observance of them. We mention one other index of intention, subsequently developed, which, standing alone in opposition to other indicia, would be of little weight, but may properly demand consideration as cumulative evidence. It is that the Act authorizing substitution, and the Act withdrawing the privilege of exemption from those who had furnished substitutes under the former, emanated from the same Congress, i. e., from the same individuals composing the Congress, under one election.
It is not one Congress repudiating the Act of its predecessor, as inexpedient or unduly curtailing its power. It is the Congress withdrawing an exemption previously granted by itself, alleging as a reason, that the altered circumstances of the country forbid its longer enjoyment. This is equivalent to a declaration that in authorizing substitution they had not intended to bind their constituents irrevocably, but to grant a privilege revocable at the will of themselves, or of their successors — an Act benign and harmless in this view, but pernicious in any other. But it is contended that if there be no contract between the government and the principal, it must at least be conceded that the former, by the 9th section of the Act of April, 1862, induced and sanctioned a contract between the principal and his substitute, and should not now be permitted to annul it. Had it been expressly declared in that section that the exemption thereby granted was revocable at the pleasure of the Legislature, this objection would certainly have been destitute of merit, yet if our exposition of the section be correct, it follows as a legal consequence that all men desiring to furnish or to become substitutes, should have so understood it, and should either have abstained altogether from contracting, or have adapted their *48 contracts to the uncertain tenure of the privilege. Having failed to do so, their present attitude is that of men who built false hopes and expectations upon the statute. But it would be a novelty in jurisprudence if their mistake were held to bind the government to an indefeasible grant never intended to be made. The government really had no concern with the terms upon which an enrolled soldier may have procured a substitute. He may have paid nothing, or he may have paid a very moderate or a very exorbitant price; he may have contracted to pay, and may have paid for the whole service in gross, or to pay an annual or monthly stipend whilst his exemption continued. In all this the government had no voice, gave no guaranty. There have been exemptions from military service allowed by Acts of the same Congress, expressly conceded in the argument, to be revocable, which appears to us, on principle, no less binding than that by substitution. We instance the exemption of persons skilled in some mechanical craft. The Congress, believing that their skill, industriously applied, would benefit the country more than their services in the field, exempted them from the latter, upon the condition, however, that they would faithfully render the former, and for a specified compensation. One of these, having his written exemption, rents for its full term premises adapted to his pursuit, purchases requisite machinery or implements and materials to be manufactured into articles of prime necessity, and engages a corps of assistants. All this he does by reason of his exemption, yet it is conceded the government may withdraw this exemption without breach of contract or semblance of bad faith. Is not his case, on principle, analagous to that of the exempt by substitution ? The one being subject to military duty has, by permission of law, substituted another person for himself; the other, alike subject, has, by a like permission, substituted mechanical service of the public at home for military service of the public in the field. Each induced by his offered exemption, has effected his special substitution by making contracts and expending money, beneficially to himself whilst it continues, unprofitably if soon terminated. The analogy may be clear to some minds by supposing the mechanical exempt to be without means to set up a *49 business on his own account, and, therefore, contracting for the full term of the service from which he has been exempted, to serve some capitalist or joint stock company largely engaged in a special branch of mechanical industry. We leave the unprejudiced thinker to run this analogy through its plain details.
We confess ourselves incapable of appreciating the logic which makes one of these exemptions revocable at will, yet throws around the other all the sanctity of an inviolable contract. We discern in neither an intention on the part of the Congress to bind the public irrevocably, and must, therefore, hold that there is wanting an essential element of contract. The character of our free institutions authorizes, nay invites severe criticism upon the acts of public servants and within reasonable limits, its effects are decidedly conservative. But, as in other salutary human agencies, there is in this scrutiny a manifest proueness to excess, tending to impute wrong designs and thereby weakening public confidence and enervating legitimate power. Against all such hurtful license the judicial mind should ever be carefully guarded. Whilst it is the paramount duty of Courts in cases within their jurisdiction to be astute and firm in protecting individual citizens against wrong and oppression, attempted by the legislative department, they are restrained by every consideration of propriety and public utility from imputing such intention in the construction of statutes, easily resolvable into the exercise of rightful authority. Here we turn aside from the argument to enter a voluntary protest against the prevalent denunciation of exempts by substitution. Whilst it would be excessive tenderness to give them relief at the cost of detriment to the public service, we can readily imagine that many of them honestly mistook their rights. Neither in availing themselves of the privilege allowed by law, nor in appealing to the Courts to define the extent of that privilege, have they exhibited any lack of patriotism or courageous manhood. That the acceptance of exemption was eminently proper in many cases, all know. That it was so in many others, not fully understood, all should readily presume. He who withholds from his neighbor this meed of justice, may live to invoke, in the future, charity for his own seeming shortcomings. Let good and *50 true men of this class neither leave home laden with unmerited reproach nor encounter it on the field to which they repair.
Were we sure that the reasoning which has led our minds to the conclusion stated would meet general acceptation, we would gladly rest these cases upon it. But as it is important that the judgment of the Court be fortified on every side, we proceed to discuss the other branch of the subject, viz: on the hypothesis that in the transaction under review, a contract was mutually intended and that the parties did all in their power to effectuate it, had the legislative and executive departments of the Confederate government combined, power to make such a contract? The argument upon the first branch of the subject was intended to show that one of the parties to the transaction, to-wit: the government had no intention to contract, and hence the element of mutual assent of minds and wills was wanting. Our inquiry now is, whether or not the same party brought to the transaction ability to contract, an element, if possible, more essential and more easily traced if it exists. We repeat in this connection, that the contract sought to be established, is that of exemption for a term of years from military service, in the defense of the country against existing foreign invasion.
Writers upon the social compact and political law, affirm the proposition inwrought with the foundation of all society, that each member owes to all the other members, (not to government) the duty of defending the State, as far as he is capable, and that governments instituted simply to administer the public affairs of organized society, are powerlesss to release him from this obligation : Burlamaque on National and Political Law, 151; Vattel’s Law of Nations, book 3, sections 8, 10; Munroe (Sec. War United States, 1814) 7; Niles W. R., 138-9; Calhoun on Gov’t, 10, 20, 53. Again, it is true of all governments invested with legislative power for the common weal, that no Legislature can, by contract, divest either itself or its successors of any power necessary to the well-being of the State: The Presbyterian Church vs. The Mayor and Council of New York, 5 Cowen, 538; Gosler vs. Georgetown, 6 Wheaton, 593; Ohio Loan, Insurance and Trust Company vs. Debolt, 16 Howard, 431; (Opinions of Chief Justice Taney and Mr. Justice Campbell.) Hamrick vs. Rouse, 17 *51 Georgia, 59, 60; Bailey vs. The State, 20 Ibid., 744. Governments Lave, in themselves, no rights to be secured or interests to be protected. They are mere agencies established for the security of rights and the promotion of interests appertaining to the founders, who, by common consent, have become the governed. To this end, they have been invested with certain necessary powers, the exercise of which devolves upon different individuals, who, in the course of time, come successively into the government. If the depository of those powers for the passing hour, may alien any one of them, so as to deny itself and its successor the exercise of it, all of the others may be so aliened, and the result "would follow, that an agency established by society for certain specified ends, may, in its discretion, defeat those very ends, which would be contrary to first principles, and subversive of all government. Applying this principle to the case at bar, we find the Congress of the Confederate States invested with the power “to raise armies” for the protection of those States. It is asserted, that they were fully invested with power to contract with Fitzgerald, Daly and Cohen, citizens of one of those States, granting them exemption from military service pending the war or for the term of three years. If they may with them, they may do the like with half a million of others, and thus, with a powerful enemy on the borders, alien by contract the entire defensive force of the country, placed at their disposal solely for its defense. If it be said that this is putting an extreme case, the reply is, that it is legitimate to test a principle, and that they have no more power to diminish than to destroy the sources of national strength. The argument thus far rests upon elementary principles, which, as has been seen, are essential to the attainment of the primary object of government and are alike applicable, whatever form it may assume.
Eut this view, however practical and sound, is not necessary to the adjudication of this question. We need not go to remote antiquity nor inquire into first principles, upon which the social compact is founded, nor yet rest upon the inalienable character of political power entrusted to all governments of whatever form for the good of the governed. The solution of the question is found in a document, accessible to all, recognized as fundamental *52 as supreme law, ordained but three years since, whereto we all were consenting. It will not be denied, that in the interval between the secession of the people of Georgia from the Federal Union and their accession to the Confederate compact they were invested with all the attributes of sovereignty. It will be conceded that among them was power oyer the entire population of the State capable of bearing arms for the common defense. When they, and the people of the other States similarly situated, formed the Confederation known as the Confederate States of America, they adopted a Constitution establishing a common government for the purposes explicitly stated in the fourth clause, third section, fourth Article, viz: That the “Confederate States shall protect each of them, (the States constituting the Confedracy) against invasion.” Among the powers conferred were those to “declare war and to raise and support armies,” section eight, Article first. By the same section the Congress was empowered “to malee all laws which shall be necessary and proper for carrying into execution the foregoing powers,” etc. The last clause (except those relating to ratification) is in these words, the “powers not delegated to the Confederate States, by the Constitution, nor prohibited, by it to the States are reserved to the States respectively or to the people thereof. These are believed to be all the claims affecting the question whether or not the Congress have the power, by contract, to exempt citizens of the several States capable of bearing arms from military service for a term of years or during an existing war. That power to make some contracts is expressly granted, and to make others, necessarily implied, cannot be questioned. As instance of the former, we mention the borrowing of money and acquisition of territory, , and of the latter, the purchase of provisions for the support of armies, and the employment of necessary agents in the discharge of proper functions.
But it would be a very latitudinary construction to infer from these the exercise of authority to make any and all contracts of whatever description. The Congress would scarcely be tolerated in engrafting upon the privilege of borrowing money that of loaning it when borrowed, and making that grant the basis of a stupendous banking institution, exclusively as a governmental *53 department. We have seen that one object for the attainment of which the Confederate Government was established is the protection of the several States against invasion, and that this was one of the inducements of the grant of power to raise armies. This imposes upon the Congress a perfect obligation to preserve that power unimpaired for the accomplishment of the end in any exigency that may arise. We have seen that whilst the States, in order to render the granted powers certainly efficacious, supplemented them by a general delegation of authority “to make all laws necessary for carrying them into execution,” they were likewise careful to close the instrument with the declaration “that the powers not delegated to the Confederate States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people thereof.” Either the people of the several States had or they liad not power to exempt their citizens, by contract, from military service anterior to the adoption of the Constitution. If they had it not, they could not delegate it to the Congress, nor could that body derive it from any other source. If they had, they and they alone still have it, unless by the Constitution, they have either prohibited it to themselves or delegated it expressly or by implication to the Congress. If they have prohibited it to themselves, the prohibition must result from the inference which would ensue from their exercise of it, with the general delegation of the power to raise armies. Were this prohibition conceded, it would not establish the transfer of the power, as we shall presently see. The consequence would be, that unless delegated, it exists’nowhere in our system, which, as we have previously shown, would be in conformity with the principles of the natural and political law. It is a pernicious power, and if it ever existed amongst us its extinction would be a subject of gratification. There are several Acts usually classed among political powers which neither the Confederate nor the State governments can now perform, for example, the enactment of bills of attainder, ex post facto laws, and statutes granting titles of nobility.
We hazard nothing in saying that the Constitution contains no express grant of the power in question. Is it then necessary and proper for carrying into execution any power confessedly *54 granted? If so, what is that power? There is none with which it has even any logical connection, except that to raise armies, and it is precisely in that connection we are told that the Congress have now rightfully exercised it. So far from being necessary and proper for that purpose, it may be well stated that when contracts of exemption are made they hinder and obstruct all subsequent efforts to raise armies, and, within the range of possibility, they might be so multiplied as to render impracticable the raising of an efficient army, or, in other words, to defeat the exercise of the power altogether. But it is said to be in the nature of things incidental to all judicious exercise of ' such power, and that the danger of abuse is no sufficient ground for its rejection. This is a mistake resulting from confounding exemption by contract for a definite term, with exemption as a privilege for no specified time. Even in war, when it may become necessary to send into the field a larger portion of the population, it is greatly desirable that another portion be left at home. There are always men who can be more useful at home than others, and more useful there than in the field. As in the raising of armies, the Congress is not bound to take the whole population, nor even the whole of a class (where resort is had to classification,) in the exercise of a sound discretion, exemption may be granted as incidental to the general power, but they must be always revocable at the will of the Congress. No man or set of men can be placed without-the pale of legislative control in this matter for a single day. Thus limited, exemptions may promote the general weal, without impairing the defensive force of the country; thus limited, they may be regarded as incidental to the general power; in any other view they become to it directly antagonistic. When a power is delegated and accepted for a specific pui'pose it is a bold solecism to denominate that which manifestly diminishes it, an incident necessary and proper to its exercise. We conclude, therefore, that there is in the Confederate Constitution no delegation of power, express or implied, to grant to individual citizens irrevocable exemption from military service, and that the Congress for that reason is without ability to make such a contract. Hence it results that the exemptions disclosed in these records are not *55 contracts, and the Act of 5th January, 1864, placing these exempts again in the service, is constitutional. In our opinion the proposition that the exemptions in question are contracts binding upon the government cannot be maintained without assuming, 1st. That the Congress of the Confederate States, whilst charged with the conduct of the war, which tasked the entire force of the country, not indispensable to the production of subsistence, deliberately intended to exempt (except in one contingency) from military service for a term of years, a considerable portion of that force, and that this intention is evinced by the use of language expressive of gratuitous privilege and not of contract. 2d. That the same Congress within a few months unblushingly repudiated their own contract. 3d. That it is in the power of a government intrusted with the defense of the body politic to divest itself, by contract, of the means of defense. 4th. That it is within the power of a Legislature, by contract, to tie up its own hands and those of its successors, so as to disqualify them partially or wholly for the performance of the most indispensable functions of legislators. 5th. That, under the Confederate Constitution, the Congress may exercise a power not only not granted expressly or by necessary implication, but operating in antagonism to another power expressly granted for a purpose vital to the Confederate States. Such assumptions we are not prepared to adopt.
The judgments of the Court below in the cases of Fitzgerald and Daly are affirmed; that in the case of Cohen reversed.