Battle, J.
 

 The bill is filed for the purpose of compelling the payment of a certain amount of taxes, claimed to be due from the defendant to the State, by virtue of the 133d section of the revenue act of 1856; (see acts of 1856, ch. 31, sec.
 
 183d.)
 
 That section is in the following words: “ The President and Cashier of the several banks in this State, except the Bank of the State of North Carolina, shall annually pay three-fourths of one per cent, intg the treasury of the State, on the stock owned by individuals or corporations in the said banks, on or before the first day of October in each and every year; provided the same does not reduce the annual profits of the owners thereof below six per cent.” &c. The defendant, which is one of the banks of this State, referred to in the above re-( cited section, resists the payment of the tax thus claimed, upon the ground that it is a tax upon the capital stock or franchise of the bank, and not upon the dividends or profits of the individual stockholders thereof; that by the charter which created the bank, the franchise was purchased from the State upon an express agreement to pay a certain annual sum as a ■consideration therefor, and that to demand an additional sum by way of tax or otherwise, for the franchise, is an attempt by the State to violate the contract, which violation is prohibited by the constitution of the United States. The section of the charter, upon which the defendant relies as evidence of this contract is the 15th, which is as follows: “The president or
 
 *289
 
 cashier of said bank, shall annually pay into the treasury of the State twelve and a-half cents on each share of said capital stock which may have been subscribed for and paid in; and the first payment of the- said tax shall be made twelve months after said bank shall have commenced operation.” As the capital stock was divided into shares of fifty dollars each, the tax was equal to one-fourth of one per cent, on each share. See acts of 1852, ch. 4, sec. 1 and 15.
 

 The counsel for the plaintiff denies that the tax imposed by the act of 1856 is one upon the capital stock or franchise of the bank. On the contrary, he insists that it is clearly a tax upon the profits of the individual stockholders which one of the officers of the bank is required to retain and pay into the public treasury. But if it be a tax upon the franchise, he contends further, that as there are no restrictive words in the charter, the Legislature had the power to impose an additional tax without violating either the words or the spirit of the contract.
 

 The questions which are thus raised by the parties, lead us to enquire, first, what is the true construction of the 133d section of the revenue act of 1856. Did the Legislature mean, thereby to tax the capital stock of the banks, or only the profits of the individual stockholders of the banks ? After a careful examination of the subject, we are satisfied that the intent was to tax the franchise; the tax, however, was not to be demanded absolutely, but only upon the condition that the bank should make profits of a specified amount. We are led to this conclusion, from the following considerations.
 

 First. There is a tax upon the dividends or profits declared upon the shares of the individual stockholders in another section of the same act, as appears from, the 20th section, which provides thus : “ Upon every dollar more than six dollars, of net dividend or profit, not previously listed, actually due or received during the year, ending on the said first day of April, upon money invested in steam vessels of twenty tons burden or upwards, or in
 
 stocks
 
 of any
 
 kind,
 
 or in shares of any
 
 incorporated or trading
 
 company, whether in or out of
 
 *290
 
 the State, and herein shall be included all
 
 bank
 
 dividends, bonds and
 
 certificates
 
 of debt, of any oilier State, a tax of four cents.”' This section of the revenue act of 1856, clearly imposes a tax upon the dividends or profits of the stock held by individuals in each and in every bank, as was decided in the ease of the
 
 State
 
 v.
 
 Petway, 2
 
 Jones’ Eq. 396, upon a similar clause of the revenue acts of 1854 in relation to the president and directors of the Commercial Bank of Wilmington. A tax of this kind being thus imposed by tho 20th section, we cannot readily believe that it was the intention of tho Legislature to impose an additional tax upon the same thing by another section of the same act.
 

 Secondly. Supposing tho words of the 133d section to be of doubtful construction, whether the burden of the tax was intended to be imposed upon the franchise or capital stock of the hanks, or upon the dividends or profits of the individual stockholders, “ a strained construction is not allowable of an act, which levies money from the citizen. The amount of the levy, the subject of it, and the method of raising it, ought to be so plainly pointed out as to avoid all danger of oppression by an erroneous interpretation ; and where there is a fair doubt, the citizen should have the advantage of it.”
 
 Attorney General
 
 v.
 
 Bank of Newbern,
 
 1 Dev. and Pat. Eq. 216. This rule, applied to the construction of a revenue act, does not militate against, but is entirely consistent with, another well settled rule, that “the grant of privileges and exemptions to a corporation, are strictly construed against the corporation, and and in favor of the public. Nothing passes but what is granted in clear and explicit terms. And neither the right of taxation, nor any other power of sovereignty which the community have an interest in preserving undimished, will be held to be surrendered, unless the intention to surrender, is manifested in words too plain to be mistaken.”
 
 Ohio Life Insurance and Trust Company
 
 v. Debolt, 16 How. (U. S.) Rep. 435;
 
 Billings
 
 v.
 
 The Providence
 
 Bank, 4 Peters’ Rep. 561;
 
 Charles' River Bridge
 
 v.
 
 The Warren
 
 Bridge, 11 Idem. 545. In the construction then, of the 133rd section of the act
 
 *291
 
 which we have now under consideration, we are to presume that the Legislature intended to put an impost upon a new subject of taxation, rather than upon one which they had already taxed in a previous section.
 

 Thirdly. "We cannot otherwise account for the exception in favor of the Bank of the State of North Carolina, than by supposing that the tax was to be upon the banking franchise, instead of upon the profits of the individual stockholders. In the charter granted by the act of 1833, to the Bank of the State of North Carolina, it is declared in a clause of the 13th section, that “each share” of stock “owned by individuals shall be subject to an annual tax of twenty-five cents, and no more, which tax shall be reserved out of the profits as they accrue, by the cashier of the principal bank, and placed to the credit of the State, on or before the first day of October in every year.” (See 2 Eev. Stat. at page 57.) Now, this tax thus imposed, has always been considered and acted upon by the different departments of the State as a tax upon the franchise of the bank, and the Legislature thought, and justly, that from the express word^ of exclusion, no additional levy could be made upon that subject; and they thought, further, that as there were no such express terms of exclusion in the charters of the other banks, or, at least, in most of them, they had a right to impose an additional tax upon the franchise or capital stock of those banks. Whether the opinion .that they had such right was well founded or not, we will examine presently, and we refer to it now only to show what was their intention in the section referred to, of the act of 1856.
 

 Lastly. We infer that it was the design of the Legislature, by the before-mentioned 133d section, to tax the franchise, rather than the profits of the individual share-holders from the manner in which it is required to be paid. By the charter of every bank in the State, it will be found, upon examination, that the tax upon the franchise is required to be paid into the public treasury, by one of the officers of the bank, while the dividends of the stockholders have been required to be listed
 
 *292
 
 by the owners of the stock, and the tax thereupon has been paid to the sheriff of the county, in the usual manner. We do not say that the tax upon the profits may not be required to be collected or retained by one of the officers of the bank, and paid directly into the public treasury, but as such a requirement is unusual in relation to such a tax, and is always prescribed for a tax upon the franchise of the bank, it is a fair indication to show what kind of impost was intended in the case under consideration.
 

 The only argument which has been, or can be urged, in opposition to this conclusion, is, that the tax refers to the profits of the share-holders, and is not to be imposed, unless those profits shall, with the tax subtracted, be equal to, or exceed
 
 six per cent, per annum.
 
 But it will be at once perceived, that this wants an essential element of being a tax upon profits, because its amount is not graduated by the amount of profits. If they exceed six and three-fourths
 
 per cent.,
 
 the: same amount is to be levied, whether they be seven, ten, or twelve
 
 per cent.
 
 In truth, the tax is, as was contended by the counsel for the defendant, a tax upon the franchise of the bank, conditional, nevertheless, upon the making of a certain rate of profits by the share-holders.
 

 The question which we have been considering, in regard to the nature of the tax, intended to be imposed by the 133rd section of the revenue act of 1856, was very important, because, if it were a tax upon the profits of the share-holders, it was conceded by the counsel for the defendant, to have been settled by the case of the
 
 State
 
 v.
 
 Petway,
 
 above referred to, that the State was entitled to a decree in the present case. But, as we have ascertained, that the tax was designed to be one upon the franchise of the bank, and not upon the profits of the share-holders therein, another very important question arises, whether the State has the right to demand, by way of tax or otherwise, a sum for such franchise, in addition to the annual impost of one-fourth of one per cent, on each share of stock, in the bank, owned by individuals, required by the charter to be paid into the public treasury of
 
 *293
 
 the State ? The counsel for the defendant, contends for the negative of this question, and after much reflection, we think that his argument is well 'sustained, both upon principle and authority.
 

 It is now universally conceded that a grant by the Legislature, of a charter, whereby a banking corporation is created, is a contract between the State and the corporation, which the constitution of the United States prohibits the State from violating. The well known definition of a a contract is, that it is an agreement between two or more persons, upon a sufficient consideration to do, or not to do, some particular thing. An analysis of it will show, that it consists of four essential parts, to wit, the parties, the agreement express or implied, the consideration, and the thing to be done or omitted. Of these, the consideration is as important as any other, and cannot be varied by either party without the consent of the other, and an attempt to do so by either party without such consent, would be a violation of the contract, as effectually as would be the breach of it in any other particular. The Legislature has the undoubted right to grant to a number of individuals the franchise of being a corporation, for the purpose of banking, or for any other useful purpose. If the grant be mainly for the benefit of the corporators themselves, the State may demand a price for the franchise, to be paid at once, in a round sum, or annually, during the existence of the corporation, by way of impost or tax. "Where the grant of the charter is tendered by the State, and accepted by the individual persons, to whom it is offered, then, the corporation springs into existence, and at the same moment, a contract arises between it and the State, which is protected by the constitution of the United States. If the price or consideration of this contract is stated, in express terms, to be a certain sum,
 
 and no
 
 more, there can be no doubt that the State would be prohibited by the constitution of the United States from demanding any thing more for the corporate franchise. Can it make any difference in principle, whether words, excluding any' addition to the price, be used or not ? When a person says that he
 
 *294
 
 will take one thousand dollars for a tract of land, does he not necessarily mean that he will take that sum, and that he will not ask any more, and if the offer is accepted, can he demand any more ? No one can hesitate as to the proper answer to be given to this question ; and the purchase of a franchise, from the State, when viewed in the light of an executed contract, is precisely analogous. And, accordingly, the Supreme Court of the United States, held, in the case of
 
 Gordon v. Appeal Tax Court,
 
 cited by the defendant’s counsel, that a stipulated price for the extension, by the Legislature, of a bank charter, without any words of restriction or limitation being used, did exhaust the power of taxation on the franchise during the period of the extension ; 3 How. Rep. 133. We admit, that in a portion of the opinion, which wo delivered in the case of the
 
 State
 
 v.
 
 Petway,
 
 there is an intimation to the contrary, but it was only an
 
 intimation,
 
 for the decision was put expressly upon another ground, and the decision itself has been very generally admitted, to have been right. If it had been necessary for us, in that case, to determine the question, whether the State had the right to impose a tax upon the franchise of the bank, in addition the price which had been already stipulated to be paid for it, we might, upon further reflection, have discovered that there was an essential difference between taxing land granted or an article of personal property, sold by the State to an individual, and taxing a franchise granted by the State to a corporation, created by the very act of making the grant. The land and chattel were things corporeal, having an existence before the grant or sale, and continuing to exist afterwards in the hands of the grantee or vendee and his assigns, independent of such grant or sale. Government cannot exist and be carried on without raising money from the persons and property of the country for its support, and this must be done by the means of imposts and taxes upon such persons and property. A franchise, unlike land or a personal chattel, has no existence until it is called into being by the act of the Legislature or sovereign power of the State, and in the very act of granting it to a corporation, created
 
 *295
 
 for the very purpose of taking it, a contract is formed between tixe State and the corporation. An essential part of this contract is, as we have already shown, the consideration or price páid, or agreed to be paid, for the franchise, and that neither party is at liberty to vary without the consent of the other. And this prohibition must continue during the existence of tiie franchise, because the contract, including the consideration, is an essential part of if, and must be co-existent with it. But though the Legislature cannot tax the franchise of the hank, they may tax
 
 ad Kbitumt\i&
 
 dividends or profits of the individual share-holders, and the corporate property of the hank, because these are separable from the franchise, and nothing can exempt them from taxation, unless there be a special agreement to the contrary between the bank and the State. See
 
 Gordon
 
 v.
 
 The Appeal Tax
 
 Court,
 
 ubi supra,
 
 and
 
 Bank of Cape Fear
 
 v. Edwards, 5 Ire. Rep. 510.
 

 Our conclusion is, that the tax imposed upon banks by the revenue act of 1856, ch. 34, sec. 133, was intended to be one upon the franchise, and not upon the profits of the share-holders, and that such tax could not, under the constitution of the United States, be demanded over and above that which was agreed to be paid by the corporation for the franchise under the terms of the charter.
 

 Pee Curiam, Bill dismissed.