The writ of certiorari in this case brings before the Court for review the judgment of his Honor, the Chief Justice, pronounced in vacation, in a proceeding on a writ of habeas corpus. The facts upon which the judgment was rendered are set forth in the petition of the applicant for the writ and the return of the officer, and they present the question whether the act of the Confederate Congress, approved 5 January, 1864, and entitled "An act to put an end to the exemption from military service of those who have heretofore furnished substitutes," is constitutional. The act is in these words:
(327) "Whereas, in the present circumstances of the country, it requires the said of all who are able to bear arms:
The Congress of the Confederate States of America do enact, That no person shall be excepted form military service by reason of his having furnished a substitute; but this act shall not be so construed as to affect persons who, though not liable to render military service, nevertheless furnished substitutes." *Page 207 
The Chief Justice, in the opinion which he has filed as explanatory of the reason upon which his judgment was founded, has declared that the petitioner, having under the provisions of the act of 16 April, 1862, furnished a substitute and obtained his discharge form military service, made a binding contract with the Government, which Congress had no constitutional power to violate. The question thus presented upon the constitutionality of the act of January, 1864, is invested with momentous importance, and has been argued before us with very great zeal and ability by the counsel on both sides. I have given to the arguments all the consideration in my power, and will produce to state the conclusion at which I have arrived and the reason which have conducted me to it.
The governments which the emigrants from Great Britain established on this continent in the sixteenth and seventeenth centuries were largely imbued with the principles of the country from which they sprang. And even when, in the eighteenth century, they severed the bonds which had connected them with mother country, and become free and independent States, the new governments which they formed, though differing widely from to old, still retained, particularly in their legislative bodies, many of the attributes and much of the spirit of the nation from which they emanated. The source form which legislative power was supposed to be derived in the nationalities of the Western (328) continent was very different from what it was in the Eastern; but the extent of power, except in the cases of a restriction by a written constitution, varies very little in the legislatures of the free States of America from that of the Parliament of Great Britain. It may aid us, then, in our investigations, to inquire what were the powers of British Parliament, and what those of the several American States prior to the formation of the Government of the United States, and subsequently of that of the Confederate States.
The power and jurisdiction of Parliament (says Mr. Justice Blackstone, quoting from Sir Edward Coke) are so transcendent and absolute that it cannot be confined, either for causes or person, within any bounds. It hath sovereign and uncontrollable authority in making, confirming, enlarging, restraining, abrogating, repealing, reviving and expounding of laws, concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime, or criminal. . . . It can, in short, do every thing that is not naturally impossible, and, therefore, some have not scrupled to call its power, by figure rather too bold, the "omnipotence off Parliament." In the exercise of these vast powers, we know that the Parliament claimed and acted upon the privilege of violating contracts, and the taking away vested rights, when it was deemed that the good of the country required it. An interesting instances of the latter kind is seen in the statute of 9 and 10 Vic., ch. 54, *Page 208 
which opened the Court of Common Pleas to the practice of the bar generally. Prior to the year 1834 the sergeants at law had had from time immemorial the exclusive privilege of practicing, pleading, and audience in that court, but in that year his Majesty, King William IV., issued a warrant under his sign manual to the judges of the court, commanding them to open it to all the other members of the Bar. The judges did so, and the sergeants, after acquiescing in the change (329) for a few years, brought the matter to the attention of the court, and questioned the authority of the Crown to take from them a valuable exclusive privilege which, from the very origin of the out, had been vested in them. After a solemn argument, the court decided against the power of the Crown to do what he warrant had commanded, but admitted that it might be done by Parliament (see 37 Eng. C. L., 338 and 362); an did being a reform which the best interests of the country demanded, it was accomplished by statute to which we have referred. It is but justice to the legislators of Great Britain to say that, though they possess this transcendent power, and have sometimes abused it, they have in the main, been very solicitous to secure intact private rights and to preserve inviolate the public faith.
We come now to the legislators of the American States, after they had gained their independence. When established by the people of their respective States, these bodies were invested at once with supreme legislative power, except in the particulars in which the people themselves, assembled in convention, had restricted them by written constitutions. See Hoke v. Henderson, 15 N.C. 1. Among the powers which they climbed and exercised was that of resuming granted lands, and of otherwise interfering with the obligations of executed and executory contracts. This is proved both by the political and judicial records of the country.Owings v. Speed, 5 Wheat., 420 (4 Curtis, 688) is a striking case directly in point. The facts are not stated by the reporter, but from the opinion of the Supreme Court, as delivered by Chief JusticeMarshall, the case will be seen as follow: The suit was brought in the Circuit Court of the United States for the distinct of Kentucky, to recover a lot of land lying in Bardstown. The plaintiff claimed under a patent issued by the Commonwealth of Virginia in 1780. A (330) part of the same land was afterward, in 1788, granted by the Legislature of Virginia to other persons, and the defendant claimed under them. A verdict and judgment were rendered for the latter, upon the ground that, when the act in question was passed, the Constitution of the United States had not been adopted; therefore, the prohibition on the State to pass laws violation of contracts, contained in that Constitution, did not apply. Here there was a case where a parcel of land, vested in one person by a patent, which was an executed *Page 209 
contracts, was taken from him and granted to another by the Legislature of the same State that had issued the patent; and yet it was sustained by the highest Court in the United States, affirming a judgment, not of one of the State courts, but of the Circuit Court of the United States. That was one mode in which the obligation of a contract was violated. Another very common one was seen in the passage of laws by which "worthless lands and other property of no value to the creditor were made a tender in payment of debts; and the time of payment stipulated in the contract was extended." See Sturges v. Crowninshield, 4 Wheat, 122 (4 Curtis, 362). These instances show conclusively that the legislatures of the different States, prior to the adoption of the Federal Constitution, claimed the power to violate contracts whenever, in their estimation, the good of the State required, and the courts felt constrained to sanction their acts by adjudications in favor of them.
Let us now see what powers were vested in the Congress of the United States. The Federal Government was established by the people of the several States, "in order to form a more perfect Union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to themselves and their posterity." To accomplish these all-important objects, each State surrendered a portion of its sovereignty, and vested it in the new Government. The attributes of sovereignty thus given up were (331) those which concerned the foreign relations of the Government. Thus we find among the enumerated powers of the Federal Constitution, the great ones, to lay and collect taxes, to borrow money, to regulate commerce, to declare and conduct a war, and to raise and support armies and navies. These powers were essentially and absolutely necessary to enable the United States to take and maintain its stand among the nations of the world. By looking at the Constitution, it will be seen that the powers are given with very few express restrictions, and with none implied, except what are necessary to the continued existence of the State governments. Where it is said that the Federal Government is one of limited powers, it is not to be understood as true in the sense that all its powers, as, for instance, the great powers of war and peace, of taxation, and the regulation of commerce, are limited, but that the number of powers granted is limited. The proper expression, then, is that it is a government ofenumerated powers, rather than one of limited powers. The truth of this, as to the power of regulating commerce, is admirably demonstrated in the able and interesting exposition of the nature and extent thereof contained in the opinions of the judges in the great case of Gibbons v. Ogden, 9 Wheat., 1 (6 Curtis, 1), and as to the power of taxation, in the opinion of ChiefJustice Marshall in the leading case of McCulloch v. Maryland, 4 Wheat., 316 (4 Curtis, *Page 210 
415). But it is the war power of the Federal Government which my argument requires me more particularly to consider. It is contained in the Constitution of the United States, Art. I, sec. 10, pars. 10, 11, 12, 13, 14, 15, and 17. This power is given in the most unlimited terms, the only restriction upon it being that, in raising and supporting armies, "no appropriation of money to that use shall be for a longer term than two years." (See paragraph 11 of the article and section referred to (332) above.) The first duty of a nation is that of self-preservation, and to that end "it has a right to everything necessary for its preservation." Vattel's Law of Nations, book 1, ch. 2, secs. 16 and 18. The framers of the Federal Constitution, being men no loss distinguished for a profound knowledge of the principles of government than for patriotism, knew this, and acted accordingly. They were master workmen, and in the edifice of government which they erected they took special care that those for whose use it was intended should have ample means to protect it. Hence, we find in No. 23 of The Federalist Mr. Hamilton declaring that "the authorities essential to the care of the common defense are those: to raise armies, to build and equip fleets, to prescribe rules for the government of both, to direct their operations, to provide for their support. These powers ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. . . . This is one of those truths which, to a correct and unprejudiced mind, carries its own evidence along with it, and may be obscured, but cannot be made planer, by argument or reasoning. It rests upon axioms as simple as they are universal — the means ought to be proportioned to the end; the persons from whose agency the attainment of any end is expected ought to possess the means by which it is to be attained." To the same effect speaks Mr. Madison in the 41st number of the same work: "Is the power of declaring war necessary? No man will answer this question in the negative. It would be superfluous, therefore, (333) to enter into a proof of the affirmative. . . . Is the power of raising armies and equipping fleets necessary? This is involved in the foregoing power. It is involved in the power of self-defense. But was it necessary to give an indefinite power of raising troops, as well as providing fleets, and of maintaining both in peace as well as in war? The answer to these questions has been too far anticipated in another place to admit an extensive discussion of them in this place. The answer, indeed, seems to be so obvious and conclusive as scarcely to justify such a discussion in any place. With what color of propriety *Page 211 
could the force necessary for the defense be limited by those who cannot limit the force of offense? If a Federal Constitution could restrain the ambition or set bounds to the exertions of all other nations, then, indeed, might it prudently restrain the discretion of its own government, and set bounds to the exertions for its own safety."
The views of these eminent statesmen and patriots as to the unlimited extent of the war power conferred by the Federal Constitution upon the Government of the United States have never been called in question. An inspection of the Constitution of the Confederate States will show that the same unlimited war power has been conferred, and in almost the same terms, upon the Confederate Government. Thus, in Art. I, sec. 8, it is declared that "the Congress shall have power (par. 11) to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; (par. 12) to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; (par. 13) to provide and maintain a navy; (par. 14) to make rules for the government and regulation of the land and naval forces; (par. 15) to provide for calling forth the militia to execute the laws of the Confederate States, suppress insurrections and repel invasions; (par. 15) to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the Confederate States, reserving to the (334) States, respectively, the appointment of the officers and the authority of training the militia according to the discipline prescribed by Congress; (par. 18) and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the Confederate States, or in any department or officer thereof."
A government thus invested with the unlimited sovereign power of declaring war and raising and supporting armies, and possessing also the scarcely less restricted sovereign powers of taxation, of borrowing money, and of regulating commerce (see Constitution of the Confederate States, Art. I, sec. 8, pars. 1, 2, and 3), must have attached to it the right ofeminent domain; for this right is an essential and inalienable attribute of sovereignty. It is so essential and so inalienable that the several States retained it as connected with their respective remaining sovereignties, notwithstanding the great powers which they surrendered to the general government, and notwithstanding they had also surrendered the power of passing any "law impairing the obligation of contracts." See R. R. v.Davis, 19 N.C. 451; S. v. Glen, 52 N.C. 321. "This right of eminent domain is the right which belongs to the society, or to the sovereign, of disposing, in case of necessity, and for the public safety, of all the wealth contained in the State. It is evident that this *Page 212 
right is, in certain cases, necessary to him who governs, and consequently is a part of the empire or sovereign power, and ought to be placed in the number of the prerogatives of majesty. When, therefore, the people confer the empire on any one, they at the same time invest him with the eminent domain, unless it be expressly reserved." See Vattell's Law of Nations, book 1, ch. 20, sec. 244. The Confederate Government (335) must also possess, as an inseparable incident of its sovereign power to declare war and to raise armies, the right to command the services of all its citizens capable of bearing arms. "Every citizen (says Vattell, book 3, ch. 2, sec. 8) is bound to serve and defend the State as far as he is capable. Society cannot otherwise be maintained; and this concurrence for the common defense is one of the principal objects of every political association. Every man, capable of carrying arms, should take them up at the first order of him who has the power of making war." Other writers on government, of great eminence, have laid down the same doctrine. See the authorities referred to in the case of Ex parte Tate, decided by the Supreme Court of Alabama at its last January term.
As the Confederate Government possessed the undoubted right of eminentdomain, those who framed its Constitution deemed it proper not to restrict the exercise of it, for that would have been highly impolitic, but to regulate it by declaring that private property shall not be taken for public use without just compensation. (See Constitution, Art. I, sec. 9, par. 16.) But there is no restriction nor regulation whatever in the Constitution on the power of the Government to command the services of all its arms-bearing population, unless it be deemed such that, for the raising and supporting of armies, there shall be no appropriation of money for a longer term than two years. (See Mr. Madison's article on this subject in No. 41 of The Federalist.)
If I have succeeded in showing, as I think I have, that the Confederate Government possesses the right of eminent domain, and has also the power of commanding the services in its army of all its citizens capable of bearing arms, I am prepared to prove that Congress had the constitutional power, by the act of 5 January, 1864, to call into the military service of the country the petitioner, Walton, notwithstanding he had previously furnished a substitute.
(336) The only obstacle in the way of my argument is the assumption, made by those who oppose it, that Walton, by procuring and putting into the army a substitute, as he was authorized to do by the act of 16 April, 1862, made a contract with the Government which the legislative department of that Government has no power to violate. Admitting, under a protestation, that a contract was made between Walton *Page 213 
and the Government, and further, that the effect of the act of 16 April, 1862, was not merely to grant an exemption as a matter of grace and favor, yet I insist that the Government had the power, whenever the necessities of the country should require, to annul and disregard it.
Let us see what is the nature of the right or interest which Walton acquired by virtue of his supposed contract. Was it property, or something in the nature of property, or a mere personal privilege? If it were none of these, I am at a loss to imagine what it was. The counsel for the petitioner say that it was property, a thing of value. Suppose it was: then the Government had an undoubted right to take it, upon making just compensation to the owner, as has already been clearly demonstrated. But it cannot be regarded as property in the sense in which that term is used in the Constitution. It cannot be "taken" from the owner. It cannot be liable to the payment of his debts; and yet it is a well established principle of law that a man cannot own property, in the proper sense of that term, of any kind, real or personal, in possession, in expectancy, or in action, legal or equitable, which cannot, in some way, or in some court, be made available by his creditors for the satisfaction of their demands. Graves v. Dolphin, 1 Sim., 66; Piercy v.Roberts, 1 Mylne and Keene, 4; Snowden v. Doles, 7 Sim., 524; Mebanev. Mebane, 39 N.C. 131; Hough v. Cress, 57 N.C. 295. It seems to me to be certain, then, that Walton's exemption from military service was not "property," which could be taken from him for (337) public use, and, not being such, there was no obligation on the Government to make compensation. As Walton's exemption from military service was not property in the sense of the Constitution, it must be regarded as a mere personal privilege, and as such it may be a thing of value. Still it was liable to the control of the Government by virtue of its right of eminent domain, or its power to command the services of all the arms-bearing population of the country. It cannot possibly escape the operation of one or the other of these two great prerogatives of government. Had it fallen under the first, then a just compensation would have been due to the owner; but being under the second, the Constitution makes no such provision in his favor. It resembles, in the respect of being personal and inalienable, the right which a person may have in an office, and it is clearly established that when the necessities or the good of the country require it, the office may be abolished, though the effect of it will be that the officer will be deprived of the emoluments without any claim to compensation on that account. Hoke v. Henderson, 15 N.C. 1;Butler v. Pennsylvania, 10 How., 416 (18 Curtis, 435). The necessities of a nation, as of an individual, have laws of their own, and that is the true meaning of the celebrated maxim, that "necessity has no law." It has a law, but it is the law of exception. "Thou shalt not *Page 214 
kill" is an injunction of the law, divine and human. "Thou mayest kill in necessary defense of thine own life" is a precept of the same law, of no less force than the other.
I have considered this case without adverting to the fact that Walton does not allege in his petition that he paid any money or other valuable consideration to his substitute to induce him to become such. If he were entitled to any compensation, then it would be difficult to ascertain the quantum. But the view which I have taken of the case renders (338) it unnecessary for me to say any more on the subject. I have alluded to it only for the purpose of showing that I had not overlooked the allegations of the petition.
Having, as I hope, vindicated successfully the power of Congress to revoke whatever right or privilege Walton had acquired by his supposed contract with the Government, made under the sanction of 16 April, 1862, I will endeavor to show what was the true nature of the contract, if contract it were. Parties who enter into a contract necessarily do so with reference to the existing law. If they use terms apparently absolute, but to which the law annexes a condition, such condition will, of course, be implied. The distinction mentioned in the books between express and implicit conditions and express and implied contracts is founded upon this principle. So if one of the parties to the contract possesses the power (which under certain circumstances it will be its duty to exercise) to annul, the other party must necessarily be supposed to enter into the contract with the understanding that it may, under such circumstances, be annulled. The party having the power to annul must be taken to have reserved it, whether it be expressed in the terms of the contract or not, and the other party must be taken to have tacitly acquiesced in such reservation. Government is the only party which can have the right to annul a contract to which it is a party; and when the exigency arises which requires the avoidance — when it may be that the very salvation of the Nation depends upon such avoidance — the Government would be faithless to the great trust confided to it if it did not proceed fearlessly to the fulfillment of its duty. He who contracts with the Government, then, cannot complain that the government avails itself of its power to put an end to the contract, in virtue of the condition impliedly annexed to it.
(339) These considerations have led me to the conclusion that Congress had the constitutional power to pass the act of 5 January, 1864, and that in doing so it did not violate its faith with the principals or substitutes by calling them again into the military service of the country. In coming to this conclusion, I have not availed myself of the authority of adjudication made by the highest tribunals in several *Page 215 
of our sister States; yet I think I might rightfully have done so. The law of Congress was intended to operate in each and all the Confederate States. It would be unequal and therefore unjust that it should take effect in some of the States and not in others. The State courts have, upon writs ofhabeas corpus, taken concurrent jurisdiction with those of the Confederate States, to decide upon the constitutionality of the acts of Congress, called the conscription acts, and with respect to them there ought to be as much uniformity of decision as is practicable. Impressed with this consideration, and knowing that the constitutionality of the act of 5 January, 1864, had been heretofore sustained by the Supreme Court of Appeals of Virginia, in Burroughs v. Peyton, 16 Grattan, 470; by the Supreme Court of Georgia, in Doby v. Harris, Fitzgerald v. Harris, Howellv. Cohen, Supplement to 33 Ga. 38; and by the Supreme Court of Alabama, inEx parte Tate, I should have been reluctant to have concurred in making a different decision. The judgment of his Honor, the Chief Justice, rendered in vacation, was given before either of the adjudications to which I have referred was made known, and of course he could not have been influenced by that weight of authority which would now, were by convictions different from what they are, press upon me.
As my brother Manly concurs in the conclusion at which I have arrived in this case, the judgment given by the Chief Justice in vacation must be reversed with costs, and the petitioner, Edward S. Walton, be surrendered to the custody of the defendant, T. H. Gatlin. (340)
EX PARTE WALTON.
The opinion of Pearson, C. J., in the case Ex parte Walton, referred to in the preceding case, is made a part of the same:
The writ issued 27 January, but the hearing was postponed under an arrangement with Col. Peter Mallett, commandant, etc., in order to have *Page 223 
a full argument. In August, 1862, the petitioner, being conscripted, put in a substitute; the substitution has been adjudged valid. The case, then, depends on the question, Had Congress power to pass the act conscripting men who have put in substitutes? The power of a judicial tribunal to declare an act of Congress unconstitutional, when it is necessary to decide the question in order to dispose of a case properly constituted before it, is settled. Acts of Congress not unfrequently involve questions purely legal, and the wisdom of giving this jurisdiction to the judiciary is manifest; for, besides the advantage of having (351) such questions passed on by those who have not become heated in the arena of politics, there is this further consideration: members of Congress are not elected because of their supposed knowledge of law, and those who have not devoted themselves to the science, however able they may be as statesmen, or eloquent as orators, are not presumed to be as good judges of law as men who have made it "a lifetime study." The courts, however, always presume an act to be constitutional, and do not declare it void except on the clearest conviction. Where, as in this instance, a dry question of the common law is involved, the judge is "more at home," and feels less embarrassment in dealing with the subject than when the question depends solely on the construction of the Constitution, as in questions of constitutional law the province of the judge and that of the statesman frequently run so nearly together as to make it difficult to distinguish the dividing line.
The power of Congress depends on the questions (1) Is substitution a contract? (2) Has Congress power to violate its own contract?
1. Is substitution a contract? This is a dry question of the common law, and should be considered without reference to politics. There are parties capable of contracting; there is a thing to be the subject of contract; so I suppose the only question that can be made is as to theconsideration. "Gain to one and loss to the other party is a legal consideration." See Coggs v. Bernard and the cases cited in 1 Smith's Lead. Cases, 283. If I lend one my horse to ride to Salem, and he takes him and starts, I am not at liberty to follow on and take my horse from him; it is a contract of bailment, although done merely for his accommodation. If you agree to carry a package for me to Salem, and start with it, I can maintain an action for breach of contract should you be guilty of gross negligence, although I was to pay nothing, and it (352) was purely for my accommodation; your undertaking to carry it and my confiding it to you, is a consideration. So, if you fancy my horse, and I tell you I will not sell, but to gratify you I agree to let you have him, if you will let me have as good a horse, and the exchange be made, title passes by "contract executed," just as if you had paid me the price in money. So, if you are bound to work for me three years at *Page 224 
wages, and for your accommodation I agree to discharge you in consideration of $500, and the money is paid, or if I agree to discharge you in consideration of your putting another man to work in your place, and it is done, there is, in either case, a contract executed, and it can make no difference whether you pay me the money with which I may get another man to supply your place, or whether you pay the money to the other man and he takes your place. This is substitution. Really, the fact that it is a contract seems too plain for discussion; it is neither more nor less than an exchange or "swap," as it is commonly called. The Government agrees to discharge a man in consideration of his putting a sound, able-bodied man in his place, and it is done; this is a valid contract.
It is true, substitution is "a privilege," but it is a privilege offered at a stipulated price, which is paid. So it is a privilege paid for, and that makes it a contract, and distinguishes it from and exemption, and because of this distinction, it is made a distinct clause in theconscription act, and is not put in the exemption act. Suppose Congress was induced to enter into the contract of substitution in reference to conscripts, in order to make conscription more palatable to the people, and as a means of relief in cases of unequal hardship, and, in reference to volunteers, the Secretary of War was induced to allow it in order to relieve some who, in a moment of enthusiasm, had entered the ranks and (353) afterwards found the service too hard for them; or suppose the inducement was that our citizens might procure able-bodied men from Ireland or Germany, and put them in the ranks as substitutes, while the citizen stayed at home and raised food and clothing; there is no principle of law by which the inducement can change the nature of the transaction or take from it the character of a contract. You are, by the terms of the contract, to furnish a sound, able-bodied man, and you do so; that is theconsideration; one man is taken for the other, just as in an exchange for horses, one horse is the consideration for the other; and the fact that it is made for the gratification or accommodation of one of the parties does not in any way affect the legal question.
The ground that substitution is a "mere privilege" is that taken in the President's message and in the debates in Congress, and that was the point mainly relied on by Mr. Kittrell and Governor Bragg in their able and learned argument on the part of the Government. For this reason I have given to it the most anxious consideration, and feel fully convinced that, although substitution is a privilege, yet, as by the agreement it was to be paid for, and the stipulated price has been paid and accepted, it is, to all intents and purposes, an executed contract according to the common law. *Page 225 
It is said Congress will not be presumed to have made a contract by which to deprive the Government of the services of those men during the war. Allow such to be the presumption, it is rebutted by direct evidence. Congress has agreed to the contract of substitution in plain and unequivocal words, so as to leave no room for construction or doubt.
Again, it is suggested, "the manufacturer is exempt upon the condition that he will dispose of his fabrics at rates not higher than 75 per cent added to the cost of production; he promises to manufacture and sell at the reduced price. Here is a privilege paid for." A condition isannexed to a gratuity, gift, or sale, by which it may be defeated; (354) a consideration forms a part of the contract itself; this is the distinction. But, it is true, they sometimes run into each other, and the conditions may constitute a consideration when, from the words used, that appears to be the intention. Whether this be the case in regard to that class of exemptions in which a condition to work at certain rates is imposed on mechanics, is a question not presented; for, take it to be so, it will only add to the list of contracts which Congress has entered into; unless an exemption be made on the ground that this is granted merely as anexemption, and no plain and unequivocal words of contract are used, as in the case in regard to substitution. It certainly has not the weight of an argument in absurdum, and that is the only point of view in which it can have any bearing.
It is also suggested, "a blacksmith, who has enlarged his business in consequence of his exemption, may say he cannot rightfully be disappointed. A similar argument was urged by Mr. Webster, to justify his change of opinion on the subject of the tariff. He said the New England States had engaged in manufacturing on the faith of the action of the Government in passing the tariff, and they, therefore, had a right to have their manufactures protected." The case of the blacksmith, like that of the tariff, presents simply a political question — shall the Government disappoint a reasonable expectation based on its prior action? — not a dry question of law. Mr. Webster, in his speech, puts it on the political ground, and nowhere intimates that the prior action of the Government amounted to a valid, legal contract. One may have reason to expect a legacy and complain should he be disappointed, but he has no legal claim, because there is no contract.
2. Has Congress power to violate its own contract? The power (355) of Congress is limited by a written Constitution. It has no power except what is conferred by that instrument, and it contains no such power, either expressed or implied. Indeed, it is excluded, for the power to make contracts, for instance, "to borrow money on the credit of the Confederate States," if there be also power to violate it, would be nugatory. No government can have power to violate its own contract, except *Page 226 
under the rule, "might makes right." The power to violate its own contract, or, in other words, the right of "repudiation," has never been claimed by the Confederate States, and I had supposed it was conceded by all that it did not have the power. But I am asked, "Cannot the Confederate States, in a case of extreme necessity, violate its own contract — not with reference to morals, but to the supreme power of the Government — and has the Government of the Confederate States less, and if less, how much less, power than other governments, in a case of extreme necessity?"
The other governments referred to have no written Constitution, and may act on the broad and arbitrary rule, "the safety of the State is the supreme law"; but the Confederate States has a written Constitution, which all officers are sworn to support. This Constitution, and laws made in pursuance thereof, is "the supreme law." The Constitution, beingwritten, can neither bend nor stretch, even in a case of extreme necessity. It is not only written and supported by oaths, but so extreme was the caution of its framers as to provide, "All powers not herein delegated to the Confederate States, or prohibited to the States, are reserved to the States respectively." In some few instances large powers are conferred to meet extreme cases — for instance, the power to suspend the writ of habeas corpus, "where in case of rebellion or invasion the publicsafety may require it," thus excluding, even in the case of "extreme necessity," any power other than those "nominated in the bond."
(356) Again, I am asked, "Admit substitution to be a contract, the power of Congress is limited by a written Constitution: where is the power to make a contract of substitution by which the Government gives up its right to the services of able-bodied citizens for the public defense in a case of extreme necessity, conferred by the Constitution, either in express words or by implication? The word substitution is not to be found in that instrument."
In reply, I might ask, Is the word conscription to be found in the Constitution? This is a Yankee mode of meeting one question by asking another, which the gravity of the subject forbids. I prefer to meet the question squarely, because I appreciate the motive which prompted it, and recognize it as fair reasoning. The power to conscript is supposed to be conferred by "the power to raise armies," in connection with the general authority "to pass all laws which shall be necessary and proper to carry that power into effect"; and in adopting the means to raise an army by conscription, it follows that Congress has power to modify the means in such manner as to make it injure the public as little as possible, and to produce as great collateral benefit as possible; in other words, to modify conscription by allowing substitution, so as to make it answer the purpose of raising an army and at the same time relieve in cases of *Page 227 
unequal hardship, and collaterally benefit the public by providing the means whereby the citizen might be left at home, to raise food and clothing for the soldiers, and "thus support the army" at the same time, that the full complement of soldiers may be kept up by substitutes brought from abroad, or found among those who are not liable to military service. Suppose Congress, in its wisdom, had required, as the consideration for substitution, that two able-bodied Irishmen or Germans should be put in the place of the citizen, would it have occurred to any one that the power to conscript did not necessarily include the power to allow substitution on such terms? The greater includes the less. And it will be remembered that substitution is not a new thing; (357) it is prominent, and taken to be a matter of course in all prior legislation, both in this country and in England. Where "the militia" is looked on as a mode of defense in cases of invasion or rebellion, and where conscription was made to take the place of the militia organization, as a matter of course it was accompanied by this prominent feature.
Mr. Kittrell, on the argument, treated the subject in a different light. He assumed substitution to be a contract, but insisted Congress had no power to make that particular sort of contract, on the ground that it would be "political suicide," for, said he, "if Congress has power to deprive the country by its contract of the services of 1,000 of its citizens, it may extend it to 100,000, and 500,000, and so we would have no citizens soldiers!" Whether it would amount to "political suicide" to have a condition of things in which 500,000 Irishmen and Germans would be in the army, to fight our enemy, while a corresponding number of citizens were at home raising food and clothing, and paying taxes to support this army, is a question into which a court is not at liberty to enter. I will observe that this mode of reasoning, by supposing extreme cases, is not apt to lead to truth, and is very apt to cover fallacy (as it manifestly does in this instance), for, allow that, in the extreme case put, it would be political suicide, does it prove a want of power, or an abuse of power? That's the question. If Congress has the power, whether it will so exercise it as to commit suicide, or to stultify itself, is a matter with which the courts have no concern, and a proper respect for a coordinate branch of the Government forbids the judiciary from making an extreme supposition in order to express a conjecture how far a power may be so abused as to avoid it and require the courts to say it shall not be exercised under that head of jurisdiction by which the courts prevent madmen or idiots from injuring themselves or "wasting their substance." (358)
Congress has power to borrow money on the credit of the Confederate States. It has (I believe) borrowed $15,000,000, and *Page 228 
pledged the export duty on cotton. It had power to do so, as a means necessary and proper to enable it to borrow the money. Run out this reasoning by supposing extreme cases. Congress borrows 150 millions more, and pledges the export duty on tobacco; it then borrows 150 billions, and pledges all export and import duties, and all money that may be raised by direct taxation; this might be political suicide or stultification, and after the money is spent, the Government would have "no assets," and no means of raising any; but will any one venture to aver, on this reasoning, that Congress had no power to borrow the 15 millions and pledge the export duty on cotton? The announcement of such a proposition would startle the commercial world.
Take a case near home: Governor Morehead proposed a plan by which to enable the Government to borrow 400 millions, in consideration, among other things, that the bonds should not at any time be liable to taxation, thereby withdrawing that amount of the wealth of our citizens from liability to support the Government in all time to come. Many said it would be unwise in Congress to withdraw that amount from liability to taxation, but no one ever suggested that Congress did not have power to make the contract; and yet brother Kittrell might run out his mode of reasoning so as to show that Congress might in this manner abuse its power and reduce itself to absolute beggary; ergo, Congress did not have the power!
It is gratifying, however, to know that I am not under the necessity of relying on my own judgment in deciding this question. The "inviolability" of a contract, whether made by the Confederate States, or (359) the State, or an individual, is uniformly upheld by the decisions of our Supreme Court, in a tone of firmness that is gratifying to every one. Search from Haywood's reports to Jones', and you will nowhere meet a decision, or a dictum, or an intimation, that the State has power to violate its own contract, or to avoid or repudiate it, on the ground that the power has been or might be abused. To mention a few: S. v. Matthews,48 N.C. 351, where the Court say, if the State has made a contract allowing the bank to issue "one-dollar notes" in so many words, the State is bound;McRee v. R. R., 47 N.C. 186, where the Court say, "If the charter grants the monopoly, and the railroad bridge or structure comes within the meaning, it is a contract, and the State is bound, unless the effect of the revolution and our bill of rights was to introduce a new order of things, and avoid all such monopolies"; Attorney-General v. Bank, 57 N.C. 287, where it is decided, "Where a price is stipulated in the grant of the charter, it is the consideration for which the sovereign makes the grant and cannot be increased; to levy a tax on the bank is to add to the stipulated price, and therefore an act of the *Page 229 
Legislature imposing such a tax is in violation of the Constitution, and void." Here is a thing withdrawn from the power of taxation by force of contract.
I have heard some express the opinion that it would have been better not to have made a Constitution for the Confederate States until after the war was over! It is sufficient that it was deemed wise to frame a written Constitution, with a grant of such powers to the Confederate States as are supposed to be ample enough to meet the emergency of the invasion and carry us through the war. The Constitution has been adopted and we are sworn to support it.
The only authority relied on to support the position that Congress has power to violate its own contract is the decision of his Honor, JudgeFrench, in the Matter of Williams.
The question is, Does that decision settle the law, or should it (360) be overruled? I am aware that, in the opinion of the Secretary of War and of his Excellency Governor Vance, the decision of a single judge on habeas corpus questions is only binding in the particular case, and I infer from the fact that none have filed opinions except Judge Heath andJudge French in this instance, that other judges take the same view; but in my opinion it is also entitled to the weight of "the authority" of "an adjudicated case," as settling the law until the judgment be reversed or the principle is overruled; for it is the decision of a tribunal of superior general jurisdiction over the subject, without appeal.
The power of a tribunal having equal and concurrent jurisdiction to overrule a decision is conceded. It is a judicial function made necessary by the imperfection of human judgment, and must be exercised in order to secure correctness of decision. True, uniformity as well as correctness are to be desired; but the former is secondary, must yield when it appears that a court has fallen into error; and the sooner error is corrected, the better, for it will spread and become the source of other errors. Williams v. Alexander, 51 N.C. 137. On consulting his books, a lawyer is sure to find "cases overruled," as instances: Stowe v. Ward,12 N.C. 57, is overruled by Ward v. Stowe, 17 N.C. 509; Wagstaff v.Smith, 39 N.C. 1, by Northcot v. Casper, 41 N.C. 303; Spruill v.Leary, 35 N.C. 225, by Myers v. Craige, 44 N.C. 169. But the jurisdiction should be exercised sparingly and only when palpable error is shown. Several circumstances were relied on by Messrs. Gilmer and Boyden as tending to weaken the authority of the decision in Williams'case. It conflicts with two decisions before made by his Honor, JudgeHeath, in the Matter of Farmer, decided June, 1863, and in the Matterof Ricks, published August, 1863. The opinion in Williams' case
does not show error in either of these decisions, and, in fact, (361) *Page 230 
takes no notice of either adjudication. So there is a conflict, and the decision now to be made is to settle the difference between Judge Heath andJudge French, by overruling one or the other. Greater respect is due to a decision made after full argument than to one made hastily and without argument. At the time the decision was made by his Honor, Judge French, this case was pending, and the hearing postponed in order to have a full argument, and if the first decision be conclusive of the law, it might tend to produce the indecent spectacle of "a race" as to who should get the first judgment; and it was stated on the argument that in Williams' case
the writ was issued, returned, and the decision made on Friday, 29 January, and the opinion filed in time to be sent 40 miles and published on Monday, 1 February, showing haste, or else that the question was prejudged.
Putting these considerations out of view, I take on myself the onus of showing palpable error. The first thing that strikes any one who reads the opinion attentively is the fact that his Honor does not deny that, according to the principles of common law, "substitution is a contract."
He says not one word about its being a mere privilege — which is the ground on which the matter is put in the President's message and the debates in Congress; but yielding that point, and assuming substitution to be a contract, he boldly takes the position — one which no politician, lawyer, or judge had ever before taken — that the Government of the Confederate States has power under the Constitution "to violate its own contract"; in other words, he avows the right of repudiation, and covers his position by setting forth an array of general principles which he supports by a long list of references. I shall only notice two of the cases cited, being decisions of our Supreme Court: S. v. Matthews, 48 N.C. 451. The charter of the Bank of Fayetteville does not authorize (362) it, in so many words, to issue one-dollar notes. Had such been the fact, there would have been no room for construction, and the Court would have decided that the act of the Legislature was void as violating a contract; but such was not the fact. The charter authorizes the bank in general terms "to receive deposits," "discount notes," and "issue notes for circulation," without saying of what denomination; and the Court came to the conclusion that by a fair construction the power to issue one-dollar notes did not form a part "of the essence of the contract," but was "a mere incident" intended by the parties to be subject to future legislation, on the ground that the Legislature will not be presumed, from the use of general words, to give up, by a contract, its power to regulate the currency; but this presumption may be rebutted by positive, that is, by the use of plain and unequivocal terms of contract, as if the charter had specified "one-dollar notes," thereby making the evidence of a contract as a positive as is done by the words used in the *Page 231 
act of Congress in regard to substitution. His Honor, in what purports to be a quotation from the opinion of Pearson, J., does me great injustice. I set out two alternative positions: "Is authority to issue small notes, conferred by the charter, as a part of the essence of the contract,with the intention to put it beyond the control of all future legislation?
or is it conferred as a mere incident, with the intention that it should besubject to such limitations as the Legislature might at any time thereafterdeem inexpedient, etc.?" He does not set out both of these positions, or either of them, but confounds them together; takes the words "as a part of the essence of contract" from the first, and substitutes them into the second, in place of the words "as a mere incident," which he omits, and this mars the sense and makes nonsense of it, and represents me as saying: the authority to issue small notes is conferred by the charter "as part of the essence of the contract, with the intention that it should be subject to future legislation," and that this is so plain (363) that a mere statement is sufficient to dispose of it. I must be allowed to object to this mode of treating the opinion of judges. McReev. R. R., 47 N.C. 186. The statement made by his Honor keeps in the background the prominent fact on which the case turns, that the structure — a bridge erected by the company — was a mere continuation ofthe road across the river; no toll was ever received on it as a bridge, and it was used in every respect as any other part of the road, and the decision is put on the ground that a structure or bridge of this sort was not in contemplation of the parties, and was not embraced by the contract. As his Honor admits substitution to be a contract, I am unable to see how these cases have any application to his position, that the Government may violate its own contract. I have not examined the many other references; indeed, it is unnecessary, for I concur in the correctness of "the general principles" in support of which they are cited; and the labor and research bestowed on these general principles only tend to prove that no case can be found to support the particular position on which his decision rests.
In support of his position, his Honor takes two grounds:
1. "There is nothing in the Constitution of the Confederate States which prohibits Congress to pass laws violating the obligation of contracts, though such a power is denied to the several States;" therefore, Congress may violate its own contract — a non sequitur. The important distinction, that the States have all legislative powers except such as are prohibited, whereas Congress has no power except it be conferred by the Constitution, is entirely overlooked. As the States have all powers except such as are prohibited, a prohibition in regard to the States was necessary. As the Confederate States has no power except it be conferred by the Constitution, a prohibition in regard to the (364) *Page 232 
Confederate States was unnecessary; all occasion for a prohibition is superseded by the article which provides, "The powers not delegated to the Confederate States by the Constitution nor prohibited by it to the States are reserved to the States respectively." So the conclusion drawn from the absence of a prohibition in respect to the Confederate States is illogical and palpably erroneous.
2. "The Congress shall have power to raise and support armies, to make rules for the government of the land and naval forces," and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the Confederate States, in any department or officer thereof."
The reasoning is this: the act of Congress conscripting men who have put in substitutes is necessary and proper to carry into effect the power to raise armies; therefore, Congress has power to violate its own contract;a non sequitur. His Honor fails to take into consideration the fact that the supposed necessity is caused by the act of Congress which allows substitution as to conscripts, and the act of the Secretary of War, 20 October, 1861, which allows substitution as to volunteers. He fails to consider that the clause to make all laws which shall be necessary and proper for carrying into execution the powers conferred by the Constitution has never before been supposed to be a grant of a general substantivepower, but is confined to the means of giving effect to the powers already conferred, and is merely the expression, out of abundant caution, of what would have been implied; and he fails to consider that the word "proper" is added to the word "necessary"; so the measures adopted must be both necessary and proper, and certainly, however great the necessity may be, it never can be proper for the Government to violate its (365) own contract; and he fails to consider the consequence to which his doctrine leads — nothing more or less than this: Congress has power to do whatever it pleases in order to raise and support an army!!! It may repudiate its bonds and notes now outstanding, a renovated currency being necessary to support the army, or it may conscript all white women
between the ages of 16 and 60 to cook and bake for the soldiers, nurse at the hospitals, or serve in the ranks as soldiers, thus uprooting the foundations of society; or it may conscript the Governor, judges, and legislatures of the several States, put an end to "State Rights," and erect on the ruins a "consolidated military despotism."
So the fact of subjecting principals of substitutes to military service sinks into insignificance when contrasted with the consequences to which the grounds on which the decision is put must lead, and for which the decision, if not overruled, may be cited as authority. I am convinced, then, there is not only palpable error in this second ground, but it is *Page 233 
destructive of society and subversive of our Constitution. For these reasons, I do not consider the case of Williams as an authority, and for the reasons above stated, I have the clearest conviction that Congress has not, under the Constitution, power to pass the act in question, and feel it to be my duty to declare that, in my opinion, it is void and of no effect.
No one can regret the necessity for this conflict of decision more than I do. What is to be its effect is for the consideration of others. It may be to leave the law unsettled, and that a "judgment of discharge" onhabeas corpus will, as heretofore, be treated as binding only in the particular case. I suggested to Governor Vance, to meet a condition of things like the present, the propriety of calling the attention of the Legislature, at its last session, to the expediency of amending the law so as to allow appeals in habeas corpus cases, and make it the duty of the Chief Justice, under certain circumstances, to call an extra (366) term of the Supreme Court. No action was taken by the Legislature. So I have no power to call a term of the Court, and the other two judges concur with me in the opinion that as the Supreme Court has jurisdiction, the law does not authorize a convocation of all the judges in vacation. My duty is plain, to decide the cases before me, according to the best of my judgment.
I must be permitted to express my obligation to the learned counsel, Messrs. Bragg and Kittrell, who argued on the side of the Government, and Messrs. Gilmer, Boyden, Scott, and Caldwell, who argued on the side of the petitioner, and Messrs. Moore and Fowle, who filed written arguments, for the assistance they have rendered me. I feel that I have heard all that can be said on both sides of the question; and if I have failed to arrive at a correct conclusion, it is because the power of judgment with which nature has gifted me, aided by a lifetime study of the principles of the law, does not enable me to make legal deductions.
I will add that the pains taken by the officers of the Government to have the question fully argued before a judicial tribunal affords a grateful assurance of a desire to have the rights of a citizen ascertained and protected by an adjudication according to the Constitution and laws.
It is, therefore, considered that E. S. Walton be forthwith discharged.
Cited: Smith v. Prior, post, 418; McDaniel v. Trull, post, 400; In reLong, post, 536; S. v. Miller, 97 N.C. 454. *Page 234 
APPENDIX
NOTE. — The cases in the appendix were reprinted from the newspaper reports of them.